421 So.2d 642 (1982)
ROYAL NETHERLANDS REALTY, INC., a Florida Corporation, and Hopkins-Easton & Associates, Inc., Appellants,
v.
John B. ROSS and Otto H. Oppenheimer, Jointly and Severally, and Milton C. Harry, Appellees.
No. 81-1528.
District Court of Appeal of Florida, Third District.
October 26, 1982.
Rehearing Denied December 6, 1982.
*643 Manners, Amoon, Whatley & Tucker and James W. Whatley, Miami, for appellants.
Holland & Knight and Daniel A. Amat and Rachel Simonhoff, Floyd, Pearson, Stewart, Richman, Greer & Weil and Robert C. Biegen, Lamchick, Glucksman & Johnston and Steven G. Glucksman, Miami, for appellees.
Before SCHWARTZ, DANIEL S. PEARSON and FERGUSON, JJ.
SCHWARTZ, Judge.
The appellants are real estate brokers who were the plaintiffs below in an action to recover a commission from the appellees Ross and Oppenheimer. On cross-motions for summary judgment, the trial court entered judgment for the defendants. Since we conclude, directly to the contrary, that the plaintiffs were shown to have earned their commission as a matter of law, we reverse the judgment under review and order that one be entered in the brokers' favor instead.
As inferentially conceded by the fact that both sides sought summary relief below, the operative facts are entirely undisputed. Ross and Oppenheimer each held a one-third interest  Milton C. Harry owned the other third  in an office building on Douglas Road in Miami. On September 19, 1979, they signed a 100-day exclusive listing agreement with the appellants "to find a purchaser[1] for said property on the following price and terms[2] or at any other price and terms acceptable to [Ross and Oppenheimer]" in return for a commission of six per cent of the sale price. Harry did not join in the execution of this contract. However, as the brokers were at all times aware, a Ross-Oppenheimer-Harry joint venture agreement contained a specific provision that, in the event of a disagreement between them as to whether to accept an offer to purchase the property, the one who did not wish to sell was required to purchase the interests of those who did on essentially the same terms.[3]
On November 5, 1979, the appellants complied with their end of the bargain contained in the listing agreement. On that date, Diplast, S.A., a Panamanian corporation which was produced by the brokers, and Ross and Oppenheimer, all executed a *644 detailed purchase and sale agreement for the parcel in question.[4] The contract specifically recognized the option provisions of the joint venture by providing that Diplast could cancel the agreement and recover its $35,000 deposit if it could not secure 100% of the realty because of Harry's refusal to agree. In accordance both with this provision and the joint venture agreement itself,[5] therefore, Oppenheimer and Ross called upon Harry to elect, as he was obliged to do, whether he would join in the sale to Diplast or purchase their interests himself. Almost simultaneously, the brokers informed the appellees that if the latter occurred, their brokerage commission would be limited to six per cent of two-thirds of the sale price, which represented the interest of Oppenheimer and Ross. On November 30, 1979, Harry informed his coventurers that he opted to buy their shares rather than sell to Diplast, which consequently withdrew from the agreement. Because of a continuing dispute over the terms of the option, however, Harry's purchase of Ross and Oppenheimer's two-thirds of the property was never consummated.[6] Apparently for this reason, they refused to pay the appellants' brokerage commission, and this action resulted.
As has been indicated, we conclude that the appellants are entitled to the $35,400 brokerage fee for which they sued[7] simply because there is no doubt that they fulfilled their contractual obligation to "find a purchaser," Diplast (or, as is developed below, Harry), which was ready, willing and able to buy the property on terms which were acceptable to, and indeed accepted by Oppenheimer and Ross. Knowles v. Henderson, 156 Fla. 31, 22 So.2d 384 (1945); Hart v. Pierce, 98 Fla. 1087, 125 So. 243 (1929).
It is equally clear that the sellers' contentions in opposition to this determination are without merit. First, since the parties specifically did not require that the commission would be earned only if a sale took place, it does not matter that Ross and Oppenheimer's interests were not in fact transferred either to Diplast or Harry. Walker v. Chancey, 96 Fla. 82, 117 So. 705 (1928); Knowles v. Henderson, supra; Schumacher v. Wellman, 415 So.2d 120 (Fla. 4th DCA 1982); 7 Fla.Jur.2d Brokers §§ 86-87, 90 (1978).
Second, it is similarly inconsequential that Ross and Oppenheimer owned only two-thirds of the land the appellants were purportedly hired to sell. It is true that the general rule, as established in Keyes Co. v. Moscarella, 223 So.2d 83 (Fla.3d DCA 1969),
that a person giving an exclusive listing agreement to a broker is bound even though the property is not owned by him at the time of the exclusive listing agreement [is] * * * subject to an exception where the broker had knowledge of his employer's inability to deliver good title because of a refusal of the co-owner to join in the employment.
*645 Bryan v. Justice, 247 So.2d 340, 341 (Fla.3d DCA 1971); Chastain v. Carroll, 307 So.2d 491 (Fla.2d DCA 1975); see also, Hensley Ins. Co. v. Echols, 159 Fla. 324, 31 So.2d 625 (1947). Although the brokers were clearly aware of Harry's outstanding interest, we nevertheless think that this "exception" may not be applied to the unique facts of this case. In cases like Bryan and Echols, the broker either had no reason to believe that the other co-owners would join in the conveyance or affirmatively knew to the contrary; thus, there was, at the least, no assurance that his employer's interests would actually be purchased. In the instant situation, however, because of the option provision of the appellees' joint venture arrangement, the plaintiffs' successful efforts in finding a purchaser meant, if the contract were followed, that Ross and Oppenheimer's two-thirds of the realty would necessarily be subject to sale on satisfactory terms  either to the buyer, if Harry agreed, or to Harry himself, if, as in the event, he did not. Thus, the brokers' employment to find a purchaser for the entire parcel was essentially to find one  either that third party or Harry  for Ross and Oppenheimer's shares. Under this analysis of the transaction, the owners in fact owned all the property, their two-thirds, which was really the subject of the listing agreement. In actuality, therefore, neither the general rule to which we have referred, nor, all the more obviously, its exception, is implicated in the legal situation before us. It follows that there is no ground[8] for denying the brokers the fee which Oppenheimer and Ross agreed to pay and which the plaintiffs  by producing Diplast and thus, alternatively and simultaneously, Harry  clearly earned.
For these reasons, we reverse the judgment under review with directions to enter judgment for the appellants against Oppenheimer and Ross[9] for the $35,400 commission, interest, costs, and, as provided by the purchase and sale agreement,[10] attorney's fees for services rendered in the trial court.[11]
Reversed and remanded with directions.
NOTES
[1] Language that the brokers' contractual undertaking was simply "to find a purchaser" is repeated no less than four times in the agreement, including the provision that the commission was to be paid "[f]or finding a purchaser for the above property."
[2] These terms included a gross sale price of $900,000.
[3] In its entirety, the clause in question provides:

5. SALE OF PROPERTY: In the event a third party shall make a bona fide offer to purchase the property from the Joint Venturers, the participant who shall receive said offer shall promptly give notice of such offer to the other participants in the Joint Venture. A bona fide offer shall be an offer in writing, accompanied by a deposit check in an amount of not less than five per cent (5%) of the purchase price, which check shall be payable to either the Joint Venturers or the trust account of a licensed real estate broker or attorney, specifying the terms of the purchase, and duly executed in the manner required by law. In the event there shall be a difference of opinion among the participants of the Joint Venture as to whether or not the offer should be accepted, then those participants who do not desire to accept the offer shall be required to purchase the interest of those participants who do desire to accept the offer at the same price contained in the offer (reduced to the prorata share of the participants whose interests are being purchased), which price shall be paid, at the option of the purchasing participants, either upon the terms contained in the offer, or twenty-five percent (25%) of the portion of the purchase price equal to the cash over the seller's pro rata share of mortgages and debts of the Joint Venture, with the balance of the cash portion of the purchase price payable in four (4) equal semi-annual installments, with interest on the unpaid balance thereof at eight percent (8%) per annum, commencing six (6) months from the date of purchase. If more than one of the Joint Venturers shall participate in the purchase, they shall each purchase the interest of the selling Joint Venturer on a prorata basis, unless they shall agree otherwise. The balance of the purchase price is to be secured by a mortgage.
[4] While the total sales price was for $885,000, rather than the $900,000 in the listing, see n. 2, supra, the reduction was of no significance since the lower price was "acceptable" to Oppenheimer and Ross. See text, supra, at n. 1.
[5] It is undisputed both that the Diplast contract was a "bona fide offer" within the meaning of the joint venture provision, see n. 3, supra, and that Diplast itself was a ready, willing and able purchaser under the familiar standard of brokerage law.
[6] This controversy is the subject of separate litigation between the joint venturers, the outcome of which proceeding in our view is totally irrelevant to the instant case.
[7] This amount is six per cent of two-thirds of the $885,000 purchase price for the entire parcel.
[8] The appellees' heavy reliance on Miller, Cowherd & Kerver, Inc. v. De Montejo, 406 So.2d 1196 (Fla. 4th DCA 1981) is clearly misplaced. That case holds only that the requirement of a commission agreement that a "sale" of the property take place was not satisfied by the owner's entering into a joint venture agreement for its development. De Montejo has no pertinence to the present issues.
[9] The effect of this decision is to reinstate, for further proceedings in the trial court, a third-party action brought by Oppenheimer and Ross against Harry for indemnity of any amounts they may be required to pay the brokers. (This accounts for the presence of Harry as a named appellee.) We express no view as to the merits of this claim.
[10] "In the event it shall be necessary for the broker or brokers to enforce collection of the payment of the real estate brokerage fee, the seller shall be obligated to pay reasonable attorney's fees and court costs to the broker or brokers."
[11] We have awarded an appellate fee of $3,000.